**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE** | : | **Chapter 7** |
| | : | |
| **BRIAN RICHARD MCCABE,** | : | |
| | : | **Bankruptcy No. 13-19715-AMC** |
| **DEBTOR** | : | |
| | : | |
| **CONOR CORCORAN,** | : | |
| | : | |
| **PLAINTIFF** | : | **Adversary Proc. No. 14-609** |
| | : | |
| **V.** | : | |
| | : | |
| **BRIAN RICHARD MCCABE** | : | |
| | : | |
| **DEFENDANT** | : | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

**I.    INTRODUCTION**

The plaintiff, Conor Corcoran ("Corcoran"), obtained a default judgment against the debtor/defendant, Brian McCabe ("Debtor"), in state court in connection with an allegedly defamatory message posted on a Myspace page. The state court subsequently held a damages hearing, in which both the Debtor and Corcoran appeared, and ultimately entered a judgment in Corcoran's favor in the amount of $75,000 and issued an opinion addressing the damages sustained by Corcoran. However, liability issues, including whether the Debtor actually posted the defamatory message or committed the underlying torts, were not litigated and decided at the damages hearing since those issues had already been resolved in Corcoran's favor by default.

- 1 -

Corcoran filed this adversary proceeding seeking a determination that the $75,000 damages award that he obtained against the Debtor in state court is a non-dischargeable debt in the Debtor's bankruptcy pursuant to § 523(a)(6). On the eve of trial, Corcoran sought to admit the transcript from the state court damages hearing in order to establish that collateral estoppel precluded the Debtor from "relitigating" the facts and issues that he argued had been conclusively determined by the state court. According to Corcoran, (1) the Debtor's underlying tort liability was actually litigated and decided by the state court during the damages hearing, and (2) the legal standards applied by the state court in determining the Debtor's underlying tort liability and assessing punitive damages against the Debtor were identical to the legal standards applicable to resolving this non-dischargeability proceeding under § 523(a)(6).

As discussed below, whether the Debtor posted the defamatory message or committed the alleged underlying torts was never actually litigated or decided in the state court proceeding, because the Debtor's liability had already been established pursuant to the default judgment against the Debtor. Accordingly, collateral estoppel is inapplicable to this case. In any event, Corcoran has failed to demonstrate the authenticity of the transcript from the damages hearing because he did not obtain a notarized certificate from the custodian of the transcript setting forth that she is the custodian of the transcript and that she compared the copy of the transcript submitted to this Court to the original transcript. Furthermore, even if the Court admitted the transcript into evidence, the only relevant and potentially admissible statement in the transcript actually supports the Debtor's contention that he never posted the defamatory message.

At trial, Corcoran failed to prove that the Debtor posted the defamatory message. As a result, the Debtor necessarily could not have caused a willful and malicious injury to Corcoran

under § 523(a)(6). The damages judgment, and any related amounts thereto, therefore are dischargeable in this bankruptcy proceeding.

## II.    FACTS AND PROCEDURAL HISTORY

Ink & Dagger was a hardcore vampire death metal band that was formed by the Debtor's late brother, Sean McCabe ("Sean"), and five of his friends in the mid-1990s. Joint Pre-Trial Statement ¶¶ B.1–.2, ECF No. 39; Trial Tr. 22:5–15, 75:9–10, ECF No. 44. The band broke up after it recorded its last album in 1999. Trial Tr. 77:12–13. Sean died in 2000, but formal estate proceedings were never initiated because he possessed no assets to be administered. *Id.* at 79:22–80:14.

Although the Debtor was never involved in the administration of Ink & Dagger, he maintained relationships with the other members of Ink & Dagger after his brother's death, albeit sparingly. *Id.* at 76:22–77:1, 78:16–79:5. The Debtor's mother, however, maintained her relationship with Jenny Park ("Park"), who was a member of Ink & Dagger and Sean's former girlfriend. *Id.*

### A.    Trademark Infringement Litigation

In 2005, the Debtor contacted Corcoran after Park told the Debtor about trademark infringement litigation ("Trademark Infringement Litigation") filed by Corcoran on behalf of the surviving members of Ink and Dagger ("Members") against Microsoft. *Id.* at 80:15–81:3. The Members alleged that Microsoft used three Ink & Dagger songs in an X-Box video game without the band's permission. Corcoran represented the Members in their individual capacities in the Trademark Infringement Litigation because Ink & Dagger did not exist as an independent entity. *Id.* at 22:5–24.

The Debtor was initially reluctant to join the lawsuit on behalf of his brother because it unearthed painful memories about his brother. *Id.* at 83:2–6. However, on December 22, 2005,

Microsoft filed a motion to dismiss the Trademark Infringement Litigation for failure to join

Sean's estate ("Estate") as an indispensable party. *Id.* at 50:18–51:2. At that point, the Debtor

retained Corcoran to represent the Estate and, on January 13, 2006, all of the parties filed a

stipulation joining the Estate as a plaintiff in the Trademark Infringement Litigation. *Id.* at

23:21–24:18, 51:17–23.

Microsoft ultimately settled the Trademark Infringement Litigation in June 2006 and a

settlement check was sent to Corcoran in July 2006. *Id.* at 24:20–25:10, 55:2–6. Corcoran

deposited the settlement check into his IOLTA Account and subsequently distributed the

Members' proportionate shares of the settlement. *Id.* at 24:20–25:20. However, he could not

distribute the Estate's share to the Debtor because the Estate's inheritance tax return was not yet

prepared or filed. *Id.*

The Debtor was frustrated by the process of preparing the inheritance tax return for the

Estate, so Corcoran offered to prepare the return for the Debtor on a pro bono basis. *Id.* at 25:19–

26:15. Corcoran warned the Debtor, however, that, because Corcoran was a litigator and

inexperienced with estate law, it would take him approximately one year to prepare and process

the return. *Id.* at 26:15–22, 57:25–58:13. In July 2007, Corcoran mailed the inheritance tax return

to the Debtor and the Debtor filed the same. *Id.* at 85:3–10. In October 2007, Corcoran called the

Debtor in an "exasperated" state after the Debtor's mother angrily accosted Corcoran via

telephone about the delay in processing the inheritance tax return. *Id.* at 85:11–22. Corcoran

asked the Debtor to explain to his mother why the return was delayed. *Id.*

**B.**     **Defamatory Message, Myspace Pages and Republication of Defamatory Message**

On October 23, 2007, the following message ("Defamatory Message") was allegedly

posted on an Ink & Dagger Myspace page ("I&D Page"):

> Bored? Call Conor Cochran [sic] and ask him why Sean McCabe's share of the
> settlement went in his pocket. Neither Sean's family nor his estate has received any
> money. It has been well over a year since the suit was settled and the rest of the
> members received their share.

*Id.* at 26:22–27:3, 29:10–12; Joint Pre-Trial Statement ¶ C.1. Corcoran testified that, at the time

that the Defamatory Message was posted, the I&D Page was connected to approximately 400 or

500 friends, including Corcoran. Trial Tr. 33:21–34:13. Shortly thereafter, Corcoran was

"unfriended" from the I&D Page so that Corcoran could no longer view postings on the I&D

Page. *Id.* at 34:7–13.

Corcoran testified at trial that the Debtor had told him that he controlled the I&D Page.

*Id.* at 27:21–28:3, 59:1–17, 68:21–69:8. Corcoran also testified that the Debtor was the only

person "doing anything to keep [Ink & Dagger's] memory alive because everybody else had

moved on doing other projects with their lives." *Id.* at 67:12–19. Based upon the foregoing and

the fact that the Debtor was "angry" and "the only dissatisfied member of the band" who had not

been paid, Corcoran believed that the Debtor was the only person who was motivated to post the

Defamatory Message on the I&D Page. *Id.* at 69:18–24.

Corcoran further testified that the Defamatory Message was actually published by the

administrator of the I&D Page, and not by a "friend." *Id.* at 64:10–17. Finally, Corcoran testified

that, because the Debtor controlled the I&D Page, he felt that the Debtor should be responsible

for any defamatory messages posted on the I&D Page. *Id.* at 61:24–62:3.

The Debtor testified that there were "several" different Ink & Dagger Myspace pages

which were created by various fans of Ink & Dagger and that "[a]nybody who was a fan could

create their own page." *Id.* at 90:23–91:4. He also testified that there was one fan-made Ink &

Dagger Myspace page which was "considered the primary one" because it "seemed to attract

more followers than others and had more photos and info than the others." *Id.* at 91:3–6.

Moreover, the Debtor testified that "anybody [who is a 'friend'] can post a bulletin on a Myspace page." *Id.* at 89:20–23.

Although the Debtor acknowledged that he was a "friend" on one of the Ink & Dagger Myspace pages, he never maintained, controlled or posted any bulletins on any of the Ink & Dagger Myspace pages. *Id.* at 91:11–92:8. He also testified that he never told Corcoran that he controlled an Ink & Dagger Myspace page nor did he ever talk to Corcoran about Myspace. *Id.* at 92:9–13. Furthermore, the Debtor testified that he did not have anything to do with Ink & Dagger, the administration of the band or the maintenance of an Ink & Dagger Myspace account. *Id.* at 76:18–24, 79:13–21.

The Debtor testified that, although his mother was frustrated with Corcoran, he was personally satisfied with Corcoran's representation and never complained to Corcoran about his representation; nor did he ever file a complaint against Corcoran with the bar association. *Id.* at 86:23–87:9.

The Debtor confirmed again that anyone who was a "friend" on the I&D Page could have posted the Defamatory Message. *Id.* at 95:11–13. The Debtor also testified that his parents were upset with Corcoran about the delay in settling the Estate and that Sean's former girlfriend, Park, who was a member of the band, as well as the other Members, knew about the delay and could have been upset with Corcoran. *Id.* at 95:14–96:8.

The Defamatory Message was also republished in an article on FunVampires.com, a publicly viewable satire/gossip website operated by Sean's friend, Brian Labuda ("Labuda"). *Id.* at 35:16–24, 92:24–93:8. The article prefaced the Defamatory Message with the following statement: "Sometime last night someone in/or close to the band issued this bulletin via the

band's Myspace account." *Id.* at 66:18–20. The Debtor testified that he never sent "any information or bulletins or articles about Mr. Corcoran" to Labuda. *Id.* at 93:1–22.

Meanwhile, in December 2007, the inheritance tax return was processed and Corcoran distributed the Estate's share of the settlement to the Debtor. *Id.* at 85:23–86:5. Although the Debtor was the administrator of his brother's Estate, he was not an heir thereunder. Rather, his parents were listed as the heirs under the Estate. *Id.* at 84:17–23. Accordingly, when the Debtor received the Estate's distribution, he transferred the entire amount directly to his parents. *Id.* at 86:2–23.

### C.    Corcoran's Prepetition Litigation Against the Debtor

On March 12, 2008, Corcoran filed a complaint against the Debtor in the Philadelphia Court of Common Pleas ("CCP") for libel and false light invasion of privacy ("Prepetition Litigation"). Joint Pre-Trial Statement ¶ B.10. Corcoran alleged, and maintains in this adversary proceeding, that the Debtor published the Defamatory Message on the I&D Page. Trial Tr. 39:19–22.

The Debtor retained David Lehman ("Lehman") to defend him in the Prepetition Litigation. *Id.* at 87:21–88:1. However, Lehman never filed a response to the complaint and, on September 3, 2008, a default judgment was entered against the Debtor. *Id.* at 88:2–19; Joint Pre-Trial Statement ¶ B.11. On February 17, 2009, a hearing was held to assess damages pursuant to Pennsylvania Rule of Civil Procedure 1037(b)(1) ("Damages Hearing"). Joint Pre-Trial Statement ¶ B.12.

At the Damages Hearing, the CCP entered an order ("Damages Order") assessing $50,000 in compensatory damages and $25,000 in punitive damages against the Debtor. The CCP subsequently entered a corresponding judgment ("Judgment") in favor of Corcoran and against the Debtor. *Id.* ¶¶ B.13–.14. On March 19, 2009, the Debtor filed an appeal of the

Damages Order. *Id.* ¶ B.15. On June 3, 2009, the CCP issued an opinion in support of the

Judgment. *Id.* ¶ B.16. On September 17, 2009, the Pennsylvania Superior Court entered an order

quashing the Debtor's appeal because Lehman failed to file the necessary post-trial motions. *Id.*

¶ B.17.

### D.    Debtor's Bankruptcy Proceeding

On November 5, 2013, the Debtor filed a Chapter 13 petition. The Debtor's case was

converted to Chapter 7 on August 1, 2014. On October 31, 2014, Corcoran filed this adversary

proceeding objecting to, *inter alia*, the discharge of the Judgment pursuant to § 523(a)(6).

Compl. ¶¶ 6–42, ECF No. 1.[1]

On April 15, 2015, Corcoran filed a motion for summary judgment ("Summary Judgment

Motion") and argued that res judicata applied and that he should not be forced "to litigate, for a

second time, the underlying merits of the defamation cause of action." Mem. Supp. Summ. J. 4,

ECF No. 17. In addition, Corcoran argued that both he and the Court relied on the Debtor's

representations in his bankruptcy schedules that the Judgment was "legitimate, and worthy of

discharge." *Id.* at 10. Corcoran argued, therefore, that the Court should grant summary judgment

in his favor pursuant to equitable and judicial estoppel.

On December 11, 2015, the Court entered an order denying the Summary Judgment

Motion ("Summary Judgment Order"), holding that (A) res judicata was inapplicable since

bankruptcy courts have exclusive jurisdiction to determine nondischargeability disputes under

§ 523(a)(6); (B) collateral estoppel was inapplicable because it was not asserted in the Summary

Judgment Motion and, even if it had been, the only issue actually litigated in the Prepetition

---

[1] Ultimately, Corcoran withdrew all of his claims against the Debtor in the complaint other than the non-dischargeability claim under § 523(a)(6). Joint Pre-Trial Statement ¶ E.3.

Litigation was the issue of damages, not liability; and (C) equitable and judicial estoppel were inapplicable because the Debtor did not assume inconsistent positions by listing the Judgment in his bankruptcy schedules and seeking its dischargeability, and because he did not act in bad faith by listing the Judgment in his schedules.

On March 25, 2016, the parties submitted a Joint Pre-Trial Statement wherein Corcoran again raised the "[l]egal effect of the entry of the default judgment" in the Prepetition Litigation. Joint Pre-Trial Statement ¶ E.2. With regard to potential exhibits that might be used at trial, Corcoran listed the transcript from the Damages Hearing ("Transcript"). *Id.* ¶ G.1.

On the eve of trial on May 17, 2016, Corcoran filed a motion for reconsideration of the Summary Judgment Order ("Motion for Reconsideration") based upon the fact that he had recently been able to obtain a copy of the Transcript, and that certain statements made by the Debtor, Lehman, and the CCP at the Damages Hearing proved that the Debtor posted the Defamatory Message. *See generally* Mot. for Reconsideration, ECF No. 41.

Corcoran stated that he had previously been unable to obtain a copy of the Transcript because, "according to the Court Reporter's Office in the Philadelphia Court of Common Pleas," the official transcript would have been destroyed by the Court Reporter's Office three years after the Damages Hearing. *Id.* ¶ 4. He also stated that he learned that the stenographer ("Stenographer") at the Damages Hearing was no longer employed at the Court Reporter's Office. *Id.* ¶ 5.

However, on April 25, 2016, Corcoran was apparently able to locate the Stenographer, "who miraculously still had a copy of the transcript from the 2/17/2009 trial on damages." *Id.* ¶ 6. Corcoran obtained a copy of the Transcript from the Stenographer on May 10, 2016, and "immediately provided" a copy to Debtor's counsel. *Id.* ¶ 7. The Transcript attached to the

Motion for Reconsideration contains a certification ("Certification") which was electronically

signed by the Stenographer on April 3, 2009, and certified that "the proceedings and evidence

are contained fully and accurately in the notes taken by me on the trial in the above cause, and

that this copy is a correct transcript of the same." *Id.* Ex. B, at 55:6–22.

The Court reserved its decision on the Motion for Reconsideration and allowed the

Debtor to file a response by May 25, 2016. On May 19, 2016, the Court conducted a trial in this

adversary proceeding in order to determine the sole issue of whether the Judgment is

nondischargeable under § 523(a)(6). The only witnesses at trial were Corcoran and the Debtor.

Throughout the trial, Corcoran attempted to introduce evidence of the Prepetition Litigation

through the newly discovered Transcript. The Debtor maintained a standing objection to

Corcoran's use of the Transcript and the Court allowed the parties to submit post-trial briefs

regarding its admissibility. *Id.* at 11:15–12:7.

On May 25, 2016, the Debtor filed a response to the Motion for Reconsideration. The

Debtor also filed a memorandum in opposition to the admission of the Transcript on July 5,

2016, to which Corcoran filed a responsive brief on August 5, 2016. Finally, the Debtor and

Corcoran filed proposed findings of fact and conclusions of law on August 15, 2016, and August

17, 2016, respectively.

## III.    DISCUSSION

Before resolving whether the Judgment is nondischargeable under § 523(a)(6), the Court

must first resolve whether: (1) the Motion for Reconsideration should be granted; (2) the

Transcript should be admitted into the record; and (3) collateral estoppel is applicable. For the

reasons discussed below, the Court has determined that the Motion for Reconsideration will be

denied, the Transcript will not be admitted and collateral estoppel is not applicable.

### A.    Motion for Reconsideration

The Motion for Reconsideration was filed under Federal Rule of Civil Procedure 60(b)

("Rule 60"), as incorporated by Federal Rule of Bankruptcy Procedure 9024, which provides that

a "court may relieve a party or its legal representative from a final judgment, order, or

proceeding." Fed. R. Civ. P. 60(b). Because Rule 60(b) only affords relief from a final order and

"[a] denial of a motion for summary judgment is not a final or appealable decision," "Rule 60(b)

does not apply to a denial of a motion for summary judgment." *PrecisionIR, Inc. v. Slawter*, 686

F. Supp. 2d 540, 542 (E.D. Pa. 2010); *see also N.Y. Football Giants, Inc. v. Comm'r*, 349 F.3d

102, 105 (3d Cir. 2003); *Hart v. Overseas Nat'l Airways, Inc.*, 541 F.2d 386, 394 (3d Cir. 1976)

(stating that the entry of an order denying summary judgment is not appealable).[2] The Court

therefore will deny the Motion for Reconsideration. The Summary Judgment Order is not a final

order and falls outside the scope of Rule 60(b).

### B.    Admission of the Transcript

Corcoran has requested that the Court admit the Transcript into evidence in order to

demonstrate that certain statements made by the Debtor, Lehman, and the CCP at the Damages

Hearing ("Statements") evidence the Debtor's admission that he posted the Defamatory Message

and intended to cause a willful and malicious injury to Corcoran. Pl.'s Br. Supp. Admission

§ 2.A, ECF No. 50. The Debtor raises objections to the admissibility of the Transcript and the

---

[2] *See also Penn W. Assocs., Inc. v. Cohen*, 371 F.3d 118, 125 (3d Cir. 2004) (citations omitted) ("The concept of 'finality' is well-settled . . . . [A] final decision [is] ' "one which disposes of the whole subject, gives all the relief that was contemplated, provides with reasonable completeness for giving effect to the judgment and leaves nothing to be done in the cause save to superintend, *ministerially*, the execution of the decree." ' Accordingly, 'there is no final order if claims remain unresolved and their resolution is to occur in the district court.'"); *Kapco Mfg. Co. v. C & O Enters., Inc.*, 773 F.2d 151, 154 (7th Cir. 1985) ("A moment's thought shows why . . . . [a] party should not get immediate review of an order . . . denying summary judgment and setting the case for trial, just by filing a Rule 60(b) motion . . . .").

Statements made therein including authenticity, hearsay and relevancy. Debtor's Mem. Opp'n

Admission 1–3, ECF No. 49.

The Court has concluded that Corcoran has failed to properly authenticate the Transcript.

In addition, the Court has reviewed the Statements and concluded that none of them could

possibly be construed as an admission that the Debtor posted the Defamatory Message, much

less that the Debtor intended to cause a willful and malicious injury to Corcoran. In fact, the

Statements actually show that the Debtor consistently denied posting the Defamatory Message

and that the issue of the Debtor's underlying liability in the Prepetition Litigation had already

been decided in Corcoran's favor by virtue of the default judgment.

The best argument made by Corcoran to authenticate the Transcript relates to Rule 902(4)

which provides that:

> The following items of evidence are self-authenticating; they require no extrinsic
> evidence of authenticity in order to be admitted:
>
> . . . .
>
> (4) Certified Copies of Public Records. A copy of an official record--or a copy of a
> document that was recorded or filed in a public office as authorized by law--if the
> copy is certified as correct by:
>
> > (A) the custodian or another person authorized to make the certification; or
> >
> > (B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute,
> > or a rule prescribed by the Supreme Court.

Fed. R. Evid. 902(4).[3]

---

[3] The Transcript clearly cannot be self-authenticated under Rules 902(1) or 902(2) because the certificate
attached to the Transcript was not signed under seal, nor did "another public officer who has a seal and official
duties" certify under seal—or its equivalent—that the Stenographer has an official capacity with the CCP and that
her signature is genuine. Fed. R. Evid. 902(1)–(2). The Transcript also cannot be self-authenticated under Rule
902(11) as a certified domestic record of a regularly conducted activity because the Stenographer failed to state that
she was the custodian of the Transcript and Corcoran failed to "make the record and certification available for
inspection" to the Debtor so that the Debtor "has a fair opportunity to challenge them." Fed. R. Evid. 902(11). Here,
Corcoran only provided a copy of the Transcript to the Debtor on the eve of trial in connection with the Motion for

In order to self-authenticate public records under this rule, however, the proponent must obtain a certification by the custodian of the public record that states that such individual is the legal custodian of the records, has compared the certified copy to the original and has concluded that the certified copy is the same document as the original. *See United States v. Watson*, 650 F.3d 1084, 1090 (8th Cir. 2011) (holding that records were self-authenticating public records admissible under Rule 902(4) because "the records were certified as correct by [the custodian], who also stated that he was the legal custodian of the records and that he had compared the certified copies to their originals"); *United States v. Weiland*, 420 F.3d 1062, 1073 (9th Cir. 2005).

Here, Corcoran has failed to take these basic steps to authenticate the Transcript. The certificate attached to the Transcript is merely electronically signed by the Stenographer and states that "the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial in the above cause, and that this copy is a correct transcript of the same." It was essentially a copy of the certificate that she originally purportedly signed after the Damages Hearing. This fails to certify that the Stenographer is the legal custodian of the Transcript or that she compared the original transcript to the copy of the Transcript that was submitted to this Court. In the absence of a notarized certificate setting forth this basic information, the Court cannot authenticate the Transcript.

Even if the Court had admitted the Transcript, however, the only admissible Statement therein would have supported the Debtor's position that he did not post the Defamatory Message.

---

Reconsideration, and there was clearly insufficient time for the Debtor to have a fair opportunity to challenge its authenticity.

Corcoran points to the following Statements made by the Debtor, Lehman, and the CCP at the

Damages Hearing:

> (A) Lehman's statement to the CCP, at the outset of the Damages Hearing: "Briefly, Your Honor, why this isn't just an assessment of damages hearing, we would try to show through testimony and through cross examination that while the act may have taken place, the actual damages that have occurred because of it are very minimal, Your Honor." Pl.'s Br. Supp. Admission Ex. C, at 7:6–12.

> (B) The CCP's statement to Corcoran's counsel immediately prior to the direct examination of the Debtor: "And I think, basically, he admits he did it anyway, but in any event, if he doesn't, he's bound by that." *Id.* Ex. C, at 45:9–11.

> (C) Lehman's statement to the Debtor at the beginning of his direct examination, which the Debtor affirmed: "Your testimony is not limited to whether you did or didn't do that, that's already been decided. Your testimony is strictly limited to the damages that have been brought to Mr. Corcoran." *Id.* Ex. C, at 46:19–23.

> (D) Lehman's statement during his closing argument: "As we all know, people get frustrated with lawyers and this was one way that somebody took out their frustration, but I don't think it raises to the level [of] the damages we're talking about." *Id.* Ex. C, at 52:23–53:2.

> (E) The Debtor's statement blurted out at the end of the Damages Hearing regarding the Defamatory Message: "I never wrote it." *Id.* Ex. C, at 54:6. And the CCP's response: "Very well." *Id.* Ex. C, at 54:7.

Corcoran argues that these Statements constitute prior inconsistent statements, as well as

statements against interest, and relate to the veracity of the Debtor's contention that he does not

know who posted the Defamatory Message and his assertion "that his actions were without the

requisite intent required by § 523(a)(6)." *Id.* at 4–5.

There is no question, as the Debtor correctly argues, that the Statements made by Lehman

and the CCP in (A), (B), (C), (D) and (E) above are hearsay and fall outside any of the

exceptions to the hearsay rules. Debtor's Mem. Opp'n Admission 3; *see also* Fed. R. Evid.

801(d)(1)(A) (a statement is not hearsay if a "declarant testifies and is subject to cross-

examination about a prior statement, and the statement: (A) is inconsistent with the declarant's

testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition").

With regard to the Debtor's affirmation of Lehman's Statement in (C), such affirmation is not hearsay pursuant to Rule 801(d)(2)(A), because statements previously made by, and offered against, an opposing party are party admissions and therefore not hearsay.[4] *See Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 96 (3d Cir. 1999) ("Under Rule 801(d)(2)(A), a statement offered against a party is not hearsay if it is the party's own statement."). However, the Debtor's Statement in (C) is irrelevant because it has no impact on the determination of whether the Debtor actually posted the Defamatory Message, or of any other fact that makes it more or less likely that the Judgment is for a willful and malicious injury pursuant to § 523(a)(6). Rather, such Statement is merely an acknowledgement that the Debtor's testimony at the Damages Hearing was "strictly limited" to the issue of damages because his underlying liability had already been determined.[5] Pl.'s Br. Supp. Admission Ex. C, at 46:19–23. The Statement therefore is irrelevant and cannot be admitted. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

The second Statement by the Debtor in (E) also is not hearsay pursuant to Rule 801(d)(2)(A). However, such Statement is simply a vehement denial that the Debtor posted the Defamatory Message which directly contradicts Corcoran's position. Thus, the only potentially

---

[4] Rule 801(d)(2)(A) provides that a statement is not hearsay if it "is offered against an opposing party and: (A) was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A).

[5] The Court notes that this Statement completely undercuts Corcoran's argument in Section III.C below that collateral estoppel should apply.

admissible Statement in the Transcript would have rebutted the arguments made by Corcoran

and supported the Debtor's testimony here that he did not post the Defamatory Message.

### C.    Collateral Estoppel

Corcoran argues that collateral estoppel precludes the Debtor from relitigating the facts

and issues conclusively determined in the Prepetition Litigation. Pl.'s Proposed Findings 6–7,

ECF No. 52. "The trial court has broad discretion to determine if collateral estoppel should

apply." *In re Cunningham*, 526 B.R. 578, 583 (Bankr. E.D. Pa.) (citing *Parklane Hosiery Co. v.

Shore*, 439 U.S. 322, 329 (1979)), *aff'd*, 541 B.R. 792 (E.D. Pa. 2015).

Collateral estoppel precludes the relitigation of an issue determined in a previous action if

the following conditions are satisfied:

> (1) the issue decided in the prior case is identical to the one presented in the later
> action; (2) there was a final adjudication on the merits; (3) the party against whom
> the plea is asserted was a party or in privity with a party in the prior case; (4) the
> party or person privy to the party against whom the doctrine is asserted had a full
> and fair opportunity to litigate the issue in the prior proceeding; and (5) the
> determination in the prior proceeding was essential to the judgment.

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50–51 (Pa. 2005) (citing *Office of

Disciplinary Counsel v. Duffield*, 644 A.2d 1186, 1189 (Pa. 1994)). Collateral estoppel does not

apply to issues resolved by default judgments because "[a] default judgment lacks the requisite

element that it be 'actually litigated.'" *McGill v. Southwark Realty Co.*, 828 A.2d 430, 435 (Pa.

Commw. Ct. 2003); *see also In re Burke*, 416 B.R. 136, 139 n.1 (Bankr. E.D. Pa. 2009) (citing *In

re McMillan*, 579 F.2d 289 (3d Cir. 1978)) (stating that "Pennsylvania state court default

judgments do not give rise to section 523 issue preclusion since issues are not actually

litigated").

The Court previously rejected Corcoran's assertion that the Debtor's liability was

actually litigated at the Damages Hearing, and therefore held that collateral estoppel was

inapplicable. *In re McCabe*, 543 B.R. 182, 189 (Bankr. E.D. Pa. 2015). The Court noted that "the CCP did not make any legal determinations regarding the Debtor's underlying liability because [the Damages Hearing] was limited to determining the amount of damages" pursuant to Pennsylvania Rule of Civil Procedure 1037(b)(1).[6] *Id.* at 189–90.

Although Corcoran now relies upon the Transcript as evidence that the CCP addressed the Debtor's underlying liability in the Prepetition Litigation at the Damages Hearing, the Court has already concluded above that the Transcript is inadmissible. Pl.'s Proposed Findings 8. In any event, the Statements that Corcoran seeks to admit actually confirm that all of the parties and the CCP understood that the Debtor's underlying liability in the Prepetition Litigation had already been resolved pursuant to the default judgment entered against the Debtor.[7]

The Court therefore reaffirms that collateral estoppel is inapplicable. The Debtor's liability was never actually litigated in the Prepetition Litigation—liability was established by default. *McCabe*, 543 B.R. at 189. In addition, the Damages Hearing was strictly limited to the damages sustained by Corcoran as a result of the presumed defamation committed by the Debtor against Corcoran. Thus, the issues actually litigated in the Prepetition Litigation are irrelevant to the Court's determination as to whether the Judgment is nondischargeable as a willful and malicious injury pursuant to § 523(a)(6).

---

[6] Under the Pennsylvania Rules of Civil Procedure, "[t]he prothonotary, on praecipe of the plaintiff, shall enter judgment against the defendant for failure to file within the required time a pleading to a complaint." Pa. R. Civ. P. 1037(b). After default judgment is entered, if the damages are not "a sum certain" and cannot "be made certain by computation," then "the damages shall be assessed at a trial at which *the issues shall be limited to the amount of the damages." Id.* (emphasis added).

[7] Specifically, the CCP stated during Lehman's cross-examination of Corcoran, in response to his counsel's objection to Lehman's proposed introduction of "any exhibits by defense counsel," that "[t]he issue here is mitigation of damages." Pl.'s Br. Supp. Admission Ex. C, at 34:17–35:6. Indeed, Corcoran's own counsel defined the issues at the hearing to be only "the damage [Corcoran] suffered as a result of the libel." *Id.* Ex. C, at 39:22–40:2, 44:14–19. Lehman also acknowledged that whether the Debtor published the Defamatory Message had "already been decided. Your testimony is strictly limited to the damages that have been brought to Mr. Corcoran." *Id.* Ex. C, at 46:18–22.

### D.    Nondischargeability of the Judgment

Section 523(a)(6) provides that "[a] discharge under section 727 . . . of this title does not

discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to

another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Thus, two distinct

elements comprise a willful and malicious injury.

In order to constitute a willful injury, the Third Circuit has held that a debtor must act

"with the purpose of producing injury or . . . with substantial certainty of producing injury." *In re

Conte*, 33 F.3d 303, 307 (3d Cir. 1994). Merely because there was "a high probability of

producing harm . . . does not establish that [the Debtor's] conduct was substantially certain to

produce [an] injury." *Id.* at 309. Thus, "debts arising from recklessly or negligently inflicted

injuries do not fall within the compass of § 523(a)(6)." *In re Malloy*, Civ. A. No. 15-5046, 2016

WL 2755593, at *7 (E.D. Pa. May 11, 2016) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 63–64

(1998)). Malice, on the other hand, "encompasses an injury that is 'wrongful and without just

cause or excuse, even in the absence of personal hatred, spite or ill-will.'" *In re Malloy*, 535 B.R.

81, 89 (Bankr. E.D. Pa. 2015) (quoting *In re Jacobs*, 381 B.R. 128, 136, 138–39 (Bankr. E.D. Pa.

2008)), *aff'd*, Civ. A. No. 15-5046, 2016 WL 2755593 (E.D. Pa. May 11, 2016).

"The burden of proving that a debt is nondischargeable under § 523(a) is upon the

creditor, who must establish entitlement to an exception by a preponderance of the evidence." *In

re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995) (citing *Grogan v. Garner*, 498 U.S. 279, 287–88

(1991)). Moreover, "[o]ne of the Bankruptcy Code's central purposes is to permit honest debtors

to reorder their financial affairs and obtain a 'fresh start,' unburdened by the weight of

preexisting debt. Accordingly, exceptions to discharge are construed strictly against creditors and

liberally in favor of debtors." *Malloy*, 535 B.R. at 88 (citations omitted).

In this adversary proceeding, Corcoran seeks a determination that the Judgment is non-dischargeable pursuant to § 523(a)(6). However, Corcoran has failed to prove that the Defamatory Message, which allegedly caused Corcoran's injury and is the basis of the Judgment against the Debtor, was actually posted by the Debtor. Although Corcoran insists that he has litigated this issue multiple times, in truth, he has never litigated this issue before any court. Moreover, Corcoran has not provided any credible evidence to this Court during trial that the Debtor posted the Defamatory Message. To the contrary, the Debtor has credibly testified at trial that he had neither the motivation nor the means to do so.

In order to demonstrate that the Debtor published the Defamatory Message, Corcoran offered circumstantial evidence through his own testimony that the Debtor, unlike the Members, was the only person who had the motivation and means to publish the Defamatory Message. With regard to motivation, Corcoran testified that the Debtor was the only client in the Trademark Infringement Litigation who did not receive a timely distribution and who was upset with Corcoran about the delay. Trial Tr. 25:12–27:3, 69:20–22. With regard to means, Corcoran testified that the Debtor said that he controlled the I&D Page in order to "memorialize" his brother's accomplishments through the band and that the Debtor was also the only person "making any effort to keep the band's notoriety alive." *Id.* at 59:8–17, 67:12–16. Furthermore, Corcoran presumed that, because the Debtor controlled the I&D Page, he was responsible for any defamatory statement published on the I&D Page. *Id.* at 61:24–62:3.

On the other hand, the Debtor testified that there were "several" different Ink & Dagger Myspace pages which were created by various fans of Ink & Dagger and that any fan could create their own Myspace page for Ink & Dagger. *Id.* at 90:23–91:4. The Debtor also testified

- 19 -

that anyone who was a "friend" on the I&D Page could post a bulletin on the I&D Page. *Id.* at 89:20–23.

Although the Debtor acknowledged that he was a "friend" on one of the Ink & Dagger Myspace pages, he testified that he never maintained, controlled or posted any bulletins on any of the Ink & Dagger Myspace pages and that he never spoke with Corcoran about Myspace. *Id.* at 91:11–92:13. In fact, Corcoran never established whether the Debtor was even listed as a "friend" on the I&D Page where the Defamatory Message was posted.

Moreover, the Debtor testified that he was satisfied with Corcoran's legal services and that he wasn't even an heir to the Estate and did not receive anything from the distribution made to the Estate under the settlement of the Trademark Infringement Litigation. *Id.* at 84:17–23, 86:16–87:4. Instead, the entire distribution went to his parents. *Id.* The Debtor credibly testified that his mother was upset with Corcoran because of the delay in processing the inheritance tax return. *Id.* at 85:11–22. The Debtor also testified that Sean's former girlfriend, who was a member of the band, as well as the other Members, knew about the delay in processing the inheritance tax return and could have been upset with Corcoran. *Id.* at 95:14–96:8. The Debtor thus paints himself as without the motive to publish the Defamatory Message and instead implies that his mother, his brother's former girlfriend or other Members may have been responsible for posting the Defamatory Message.

The Court finds that the Debtor credibly testified that all of the Ink & Dagger Myspace pages were run by fans of Ink & Dagger. Thus, Ink & Dagger did not have an official Myspace page and the I&D Page was actually run by one of the fans of Ink & Dagger, and not by the band itself. In addition, the Debtor acknowledges that, once an individual becomes a "friend" on an Ink & Dagger Myspace page, the "friend" can post a bulletin on such page.

Corcoran's argument that the Debtor was the only individual who had the means to post

the Defamatory Message on the I&D Page is based on: (1) his belief that the I&D Page was run

by the band and that the Debtor must have been in control of the I&D Page because, at that time,

he was the only person doing anything to keep the band's memory alive; and (2) his recollection

that the posting was made by the administrator of the I&D Page, and not by a "friend," which

meant that the Debtor must have been responsible for posting the Defamatory Message. *Id.* at

64:10–12. This argument, however, is based upon the false assumption that the I&D Page was

established and controlled by Ink & Dagger, and therefore through the Debtor who was the only

person interested in preserving the band's memory, and not by a fan of Ink & Dagger.

The Court finds that the Debtor credibly testified that there were numerous Ink & Dagger

Myspace pages which were all run by fans and that the band itself did not establish or control

any of the Myspace pages. There is also no evidence, other than Corcoran's testimony, that the

Debtor ran the I&D Page. Thus, even if Corcoran's recollection is correct that the Defamatory

Message was posted by the administrator of the I&D Page, there is no evidence that the Debtor

was the administrator of the I&D Page; rather, there is only evidence that the I&D Page was run

by a fan.

Based upon the testimony at trial, the Court finds that the Defamatory Message was most

likely posted by a "friend" on the I&D Page since it is unlikely that a fan acting as the

administrator of the I&D Page would have the necessary information to post the Defamatory

Message. Although it is possible that the Debtor posted the Defamatory Message on the I&D

Page, it is also possible that either his parents or one of the Members posted the Defamatory

Message. In fact, the only individual who ever expressed frustration with Corcoran was the

Debtor's mother, which is consistent with the fact that she and her husband were the only

individuals with a financial interest in the Estate's settlement proceeds. In addition, the Debtor's

mother actually called Corcoran right before the Defamatory Message was posted and was

"hollering" at him about the delay in processing the inheritance tax return. *Id.* at 85:15–20. In

contrast, the Debtor never complained to Corcoran nor is there any evidence in the record that

the Debtor complained to anyone else about Corcoran's services. Based upon the foregoing, the

Court finds that Corcoran has failed to prove that the Debtor posted the Defamatory Message.

Because Corcoran has failed to demonstrate that the Debtor posted the Defamatory

Message, he obviously cannot demonstrate that the Debtor intended to cause a willful and

malicious injury to Corcoran pursuant to § 523(a)(6).

In addition to failing to establish that the Debtor caused Corcoran's injury, Corcoran has

also failed to apply the facts of this case to the law governing § 523(a)(6) nondischargeability

proceedings. In fact, it appears that Corcoran rests his entire case upon the fact that the CCP

imposed punitive damages against the Debtor in order to demonstrate that the Debtor committed

a willful and malicious injury. Pl.'s Proposed Findings 5–8. The most generous reading of his

argument is that, in Pennsylvania, punitive damages are awarded for, *inter alia*, willful and

malicious conduct, therefore, in awarding punitive damages, the CCP "implicitly" determined

that the Debtor's conduct was willful and malicious. Mot. for Reconsideration ¶¶ 31–32.

However, an award of punitive damages is not necessarily a finding of willful and malicious

conduct because, in Pennsylvania, punitive damages may also be awarded for reckless conduct.[8]

---

[8] The cases that Corcoran cited do not support his argument because they permit punitive damages for
merely reckless conduct. *See Hall v. Jackson*, 788 A.2d 390, 403 (Pa. Super. Ct. 2001) (permitting punitive damages
"if an actor's conduct was malicious, wanton, willful, oppressive, *or exhibited a reckless indifference to the rights of
others*") (emphasis added); *Johnson v. Hyundai Motor Am.*, 698 A.2d 631, 639 (Pa. Super. Ct. 1997) (stating the
same); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 447 (Pa. Super. Ct. 1987) (permitting punitive damages
for conduct that was "outrageous, because of the defendant's evil motive *or his reckless indifference to the rights of
others*") (emphasis added). Merely reckless conduct is not willful or malicious for the purposes of § 523(a)(6). *See
In re Vidal*, Bankr. No. 10-14071, Adv. No. 10-0335, 2012 WL 3907847, at *27 (Bankr. E.D. Pa. Sept. 7, 2012)
(quoting *Kawaauhau*, 523 U.S. at 61–62) (stating that if "Congress meant to exempt debts resulting from

- 22 -

Because "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)," the award of punitive damages by the CCP alone does not establish that the Debtor caused Corcoran a willful and malicious injury. *Malloy*, 2016 WL 2755593, at *7 (quoting *Kawaauhau*, 523 U.S. at 63–64). Finally and critically, the CCP never explained the punitive damages standard that it applied to the Debtor's conduct therein.

Based upon the foregoing, the Court finds that Corcoran has failed to prove that the Debtor posted the Defamatory Message and, therefore, necessarily cannot prove that the Debtor willfully and maliciously injured Corcoran pursuant to § 523(a)(6).

## IV.  CONCLUSION

The Court thus denies Corcoran's Motion for Reconsideration and holds that the Transcript is inadmissible based upon Corcoran's failure to properly authenticate it. Because Corcoran has failed to prove that the Debtor willfully and maliciously injured him under § 523(a)(6), the Court holds that the Judgment against the Debtor, and any interest and attorney's fees incurred in connection with the Judgment, are hereby discharged in the Debtor's bankruptcy proceeding. Judgment will be entered in favor of the Debtor and against Corcoran in this adversary proceeding.

An appropriate order follows.

Date: October 27, 2016

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

---

unintentionally inflicted injuries [under § 523(a)(6)], it might have . . . . selected an additional word or words, i.e., 'reckless' or 'negligent,' to modify 'injury'").